Christian, J.
This is an appeal from a decree of the Circuit court of the city of Richmond.
The case is for the second time before this court.
The novelty of the questions which it presents, the *735 importance of the principles to he settled, the marked ability and. learning -which have characterized the arguments of counsel, who with equal confidence, have pressed the claims of their respective clients, have demanded and received from this court a careful aud anxious consideration.
When the case was before this court in 1869, there was no expression of opinion, as to the merits of the controversy; but the plaintiff" in the court below (Zetelle) having instituted his action at law, as well as his suit in equity, on account of the same transactions, this court sent the cause back to the Circuit court, with directions to that court, to make an “order requiring the said plaintiff to make his election within a specified time, whether he would amend his bill in this case so as to embrace therein the transactions under the power of attorney, as well as those uuder the deed of trust, aud dismiss his action at law, or whether he w’ould prosecute his action at law.”
In accordance with this order, the plaintiff (Zetelle) dismissed his action at law, aud at March rules, 1869, filed his amended bill, to which bill Gustavus A. Myers, Frederick J. Cridland and Andrew Pizzini were made defendants. Gustavus A. Myers having departed this .ife after the bill was filed, it was revived by scire facias against his executor, and od the 10th day of January 1870, the Circuit court of the city of Richmond, pronounced its decree, directing, “that the defendants, Frederick J. Cridland and William B. Myers, executor of Gustavus A. Myers, deceased, out of the assets of his testator’s estate in his hands to be administered, do pay to the plaintiff, nine thousand seven hundred and eighty-three dollars and fifty-three cents, with legal interest thereon from the 16th day of January 1863, till paid ; and that the defendant, Audrew Pizzini, do pay to the said plaintiff the sum of five thousand dollars, with legal interest thereon from the 1st day of November 1861, till *736 paid.” From this decree Myers’ executor and Pizzini ^ave been allowed an appeal by this court; and the ease is now before us to be considered on its merits.
The facts disclosed by the record are substantially as follows:
Spiro Zetelle, a resident of Richmond, of foreign birth, and who had not been naturalized, being about to g0 t0 Europe, for an indefinite time, on the 9th day of September 1861, executed a power of attorney by which he constituted Gustavus A. Myers and Frederick J. Cridland his agents and attorneys in fact, for the management and disposition of hi3 property and business during his absence from the country. The powers conferred by this instrument were of the most ample character, and will he more particularly noticed presently.
At the time this power was executed, Zetelle was the owner of a house and lot in the city of Richmond (which was in the occupation of a tenant), together with some furniture and personal effects ; and also had debts due to him, amounting to several thousand dollards, due at different times from November 1st, 1861, to November 1st, 1865. On the same day (September 9th, 1861,) on which the powTer of attorney was executed, Zetelle and wife executed a deed by which they conveyed the house and lot to Myers aud Cridland, trustees, with power to lease, rent, or sell the same, “ as to the said trustees shall seem most beneficial.” This deed of trust, and powrer of attorney, executed at the same time, and for the purpose of effecting the same general object, to wit: the management and disposition of the plaintiff’s property during his absence from the country, were duly executed and -admitted to record in the clerk’s office of the Hustings • court for the city of Richmond on the 11th of September 1861. Shortly thereafter Zetelle, with his family, Heft the country for Europe, and did not return to Richmond until April 1865. No communication was received *737 by Myers and Cridland, or either of them, from Zetelle, during his absence.
In March 1862, Myers and Cridland made sale of the real estate and received the proceeds of sale. Among other evidences of debt received by them from Zetelle was a bond of Andrew Pizzini for five thousand dollars, payable on the 1st day of November 1865 ; and secured by'a deed of trust on certain real estate in this city ; also three negotiable notes of O. Wendlinger for $1,080 each, payable at six, twelve, and eighteen months from the 1st July 1861. These were also well secured upon real estate in the city of Eichmond.
Pizzini’s debt was paid on the 9th January 1863, and the notes of Wendlinger were paid, the first in January 1862, and the other two in July 1862. These debts, as well as the proceeds of sale of the real estate, were all paid in Confederate States treasury notes, these being the only currency in circulation at that time. These different amounts, together with collections made of rents,- and sales of furniture, were deposited, as received, in the Farmers Bank of Virginia, to the credit of Myers and Cridland, attorneys and trustees of Zetelle; and all checks drawn upon the fund were signed by both Myers and Cridland. In January 1864, the balance remaining to their credit was invested in Confederate States eight per cent, coupon bonds. These bonds, enclosed in an envelope, were deposited in the Farmers Bank, endorsed with the following words: “ 15 C. S. bonds representing $14,500, with coupons attached to the bonds. The property of Spiridione Zetelle, an Ionian subject, and under the protection of Great Britain. Deposited in the Farmers Bank of Virginia by Gustavus Ao Myers and Frederick J. Cridland, attorneys and trustees of said Zetelle. January 21, 1864.” This endorsement is in the hand-writing of Cridland. It is evident that the agents had two objects in makiny this deposit and endorsement: first, to keep the fund\ v *738 rate and distinct from their own funds; and second, to protect the fund against the sequestration laws of the Confederate Congress ; Zetelle being an alien.
After Zetelle returned to Richmond in April 1865, he called upon Myers (Cridland having removed to another gtate) for an account of the agency and trust. A full • ' ° ° and specific account was rendered by Myers, showing amount which had been received, and paid out, and that the balance (except a small amount which remained in Confederate notes) had been invested in Confederate bonds. This settlement Zetelle indignantly rejected, and brought his suit charging his agents with a breach of trust, in receiving Confederate currency, in payment of debts due to him; in selling his real estate for that currency, and in making investments for him without authority in Confederate bonds ; and in failing to collect and remit to him, money which he contends they had undertaken to do; and by the amended hill charging that Andrew Pizzini was an active participant for his own advantage, in the gross violation of duty and breach of trust, on the part of his agents; and that the payment of his debt to the said agents was in no wise a just or legal satisfaction of said debt.
This amended bill is answered by Myers and Pizzini; Cridland having been proceeded against as a non-resident.
Myers denies all the allegations of the plaintiff’s bill as to any agreement upon the part of himself and his co-agent, to remit the proceeds of the sales of property or other collections made by them to the plaintiff'; and emphatically declares, that if any such suggestion had been made, at the time of the execution of the power of attorney, that he would be expected to remit funds to Europe during a time of war and blockade, “ he would unhesitatingly have declined the agency, however pressed upon him.” He denies that he and Cridland acted without authority, in receiving Confederate currency, and in making investments in Confederate securities, and points *739 to the power of attorney and the deed of trust, which he insists conferred upon them the most ample powers to act for the plaintiff in his absence, as they would for themselves, in the condition of affairs which should exist during his absence. He denies that he was guilty of any violation of duty or breach of trust; but that what he had done was done in the honest exercise of a discretion voluntarily conferred by the plaintiff’, by an instrúment that invested him with the most ample powers and the largest discretion.
The answer of Andrew Pizzini admits the payment to Gustavus A. Myers, attorney in fact for Spiro Zetelle, of the sum of $5,657.50, the principal and interest of his bond due said Zetelle, and that the payment was made in Confederate States treasury notes. And he insists,, that this was a valid payment, made to one authorized to receive it, and that he was in no manner bound to see to the application of the money which he paid to such agent.
So much for the answers. The evidence in the cause (other than documentary) consists in the main of the depositions of the parties to the suit, there being but three other witnesses, 'W’endlinger, Yon Groning, and Joseph J. Cridland, who were examined. And these witnesses knew but little of the transactions between Zetelle and his agents material to the matter in controversy. Ye may expect, therefore, to find such testimony conflicting and contradictory, and in the absence o£ documentary evidence, if the case stood alone upon parol proof, it might be difficult (according equal honesty and truth to the parties), to reconcile conflicting statements so as to arrive at a just conclusion.
But this conflict of evidence, which arises out of the different views and understanding of the parties, as to the character and objects of the agency and trusts, must be settled by reference to the terms of the instruments creating that agency and those trusts. If upon the faces *740 of these instruments of writing, voluntarily executed by Zetelle, by fair and reasonable construction of the language used, the nature, object and scope of the powers conferred, and trusts imposed plainly appear, then the parol proof need not, and ought not, to be resorted to in leading us to our conclusion.
.First, let ns look to the power of attorney. The p0Werg conferred by this instrument were of the most ample character. In addition to the enumeration of many particular powers, there are general clauses giving the widest scope to the powers conferred. For example, “ to do, transact, execute and perform all proper, legal, equitable, needful, and requisite acts, matters and things relative to any affairs, business, and concerns of all and every kiud whatsoever, noue excepted or reserved.” * # “ It being meant and intended by me, to authorize and empower my said attorneys, or either of them, to do every matter and thing for me, in any right and capacity whatever, which can possibly be devised or lawfully done, although the same may be omitted to be herein particularly set forth.” And again, “And, moreover, in and about the premises to do, transact, execute and perform such other acts, matters and things as shall be deemed needful and most beneficial, as fully and effectually to all intents and purposes, as I myself might or could do by being personally present.” It is difficult to conceive how any form of words or use of language could confer more ample powers or larger discretion upon agents, than is conferred by this power of attorney.
In addition to these general powers above enumerated, these agents are authorized specially, “ to recover and receive of and from all governments, bodies politic or corporate, as well as from all and every person and persons whatsoever, whom it may concern, and to give receipts and acquittances for all such sum or sums of money, goods, wares, merchandise, effects, interest, instalments, debts and demands whatsoever, as now is, or are, *741 or shall or may be hereafter due, owing, belonging to, or payable unto m.e.”
In order to authorize Myers and Oridland to effect a sale of his real estate, and convey the title to a purchaser in case of sale, Zetelle and wife (on the same day on which the power was signed) executed and delivered a _ deed whereby they conveyed a house and lot to the said Myers and Oridland, “upon trust to lease the same for such term and for such rent as they or either of them might think most advantageous,” &c. * * * “And upon further trust at such time, and in such manner, and upon such terms as the said trustees or either of them should think most beneficial, to make sale of said property, and to collect all sums arising from such rents and sales.”
The deed of trust and power of attorney were executed at the same time, and for the purpose of effecting the same general object, namely : the management and disposition of the plaintiff's property and business during his absence from the country. They constituted, in fact, but one general agency, the power of attorney embracing all the property, and the deed of trust embracing the real estate only, for the purpose of investing the agents with an authority which was not, and could not have been conferred by the power of attorney, namely : the authority to pass the title and interest of Mrs. Zetelle in case a sale was made of said real estate.
Looking to the deed of trust and the power of attorney, as constituting the agency of Myers and Oridland, for the management and disposition of the plaintiff’s property and business during his absence in Europe, and defiuing their powers, it must, at least, be conceded, without considering at all the parol proof in the cause, that Zetelle voluntarily conferred upon these agents power to receive and collect all moneys due to him, as well as to sell his property, both real and personal, and to receive and collect the proceeds of such sale. This much is *742 beyond dispute. It must also be conceded, that the Power to collect necessarily carried with it the power to co^ectin Confederate currency, because no other currency was in circulation during the existence of the agency. And this is the more apparent when in an instrument ^rawn ^ie utmost particularity, no reference is made to the kind of currency which the agents are required to rece^ve and collect, although at the time of the execution of the power of attorney Confederate currency was coming into general circulation, and became soon afterwards the only currency of the country.
But it is insisted that the only object which Zetelle could have had in authorizing the collection of debts due to him, and the sale of his real estate, was, that the same might be remitted to him in Europe. It is urged, therefore, that if the currency was of such a character as not to be made available to him, or if during the war and existing blockade this could not be done, then there was no excuse or justification on the part of the agents in receiving debts not due for several years, well secured by mortgage on real estate, or in making sale of valuable real estate for a depreciated currency, when there was no necessity or propriety for the sale ; and that their conduct in this respect was a gross violation of duty and breach of trust for which they ought to be held liable.
It is argued with great force, by the learned counsel for the appellee, that however ample the powers conferred by the power of attorney and deed of trust, yet they must be construed with reference to the objects and purposes for which the agency was created. Audjconceding (say they) that the agents had the unquestioned authority to collect the debts due their principal, and to sell all his property, real and personal, yet the only object in conferring such power to collect aud to sell must have been to make the funds available to Mm, by remitting to him in Europe.
Certainly this argument would carry with it almost *743 Irresistible force, if the fact upon which it was predicated be admitted, to wit: that Zetelle had determined permanently to change his residence ; that he intended to leave the country never to return, and that this intention was communicated to his agents. Upon the theory assumed in the argument, that Zetelle left the country with the view of making his permanent abode in a foreign land, and that his desire and purpose was to have his property •converted into such funds as might be available to him in the country where he proposed to locate, and that this intention and this purpose was communicated to his agents, it would be indeed difficult if not impossible for his agents to excuse or justify their conduct. It becomes, therefore, an important enquiry, as to what were the purposes of Zetelle in this respect, and whether these purposes were communicated to his agents. For if it be shown that he proposed to be absent temporarily only; to remain abroad until the war then waging should be brought to a close, and then to return again to this city which for many years had been his residence, and where he had met with much prosperity in his business ; if it was his purpose simply to escape with his family from the dangers and privations of war, and avoid the vicissitudes of a civil strife, in which he as an alien had no interest, with the purpose to return with returning peace, then indeed the conduct of his agents must be viewed in a very different light. Or whatever may have been his purposes in this respect, if it he shown that he did not make known his purpose to his agents, but left them in ignorance of his plans, and gave them no spe•cific instructions as to remitting to him, or as to the kind of currency to be received by them, or investments to be made for him, these facts must materially explain the •conduct and affect the liability of the agents.
In his origiual bill Zetelle says he was .about to go back to Europe, “ to remain for an uncertain period ; it .might he for life.” Many months after the bill is filed *744 and the answers of the defendants are in the cause, when produced as a witness, in response to a leading question counsel; whether, when he left, it was his purpose to change his domicil and make his permanent residence in Europe, he answers “Yes.” "When this determination was first formed does not appear. Certain it is, it * was not his purpose to change his domiciJ ana make his permanent residence in Europe on the 17th July 1861, less than sixty days before the execution of the power of attorney; for on that day a deed was put upon record in the Hustings court, conveying to Zeteile the same house and lot conveyed to Myers and Cridland by the deed of trust of September 9th, 1861. It could hardly have been his determination then to go permanently abroad, or he would not have purchased real estate in the city of Richmond. In point of fact he did return to the United States in the latter part of the year 1862, or early in the year 1868.
But whatever might have been his purpose, whether his absence was to be permanent or only temporary, certain it is that there is no sufficient proof in the cause from which we can conclude that his agents had any knowledge of his purposes in this respect. "While Zeteile says that he communicated his intentions to his agents, both Myers and Cridland deny that they had any knowledge of his purpose to leave the country permanently ; but both declare that they understood his purpose was to remain in Europe temporarily, during the continuance of the war. They both emphatically deny that there was any understanding or agreement that they should be required to undertake the remission of funds to Zeteile in Europe.
á Myers in his answer says—“ This defendant emphatically denies that there was by him, or in his presence, or to his knowledge, anything to show a purpose or understanding that the proceeds were during the then existing war, to be paid over or remitted to the plaintiff, beyond *745 the limits of Virginia. So far from its being true, that this defendant was informed by the plaintiff before he executed said papers, that his object was that the net proceeds should from time to time be remitted to him, this defendant says that if he had been so informed, he would unhesitatingly have declined to undertake the i o j agency however pressed upon him. ff or while the coast was blockaded there was great difficulty in remitting to Europe ; it was not only troublesome and objectionable in other respects, and with his other engagements there was no adequate motive to induce this defendant to undertake it.”
Cridland, in his deposition, in answer to the following question, “"Were any instructions, written or verbal, given to you, or as far as you know to Myers, by Zetelle, as to remittance to him by you or said Myers, or both of you while the said Zetelle should be absent from America?” Says, “Ho instructions were given to me, and, as far as I know, none were given to Mr. Myers, or if they were I never saw them.” Again, he says : “ I was not informed by Mr. Zetelle in regard to remitting him money after he left Richmond. I did not understand that the agency was created for any such purpose» My understanding of the agency was this : that it was created by Zetelle because he intended to leave Richmond, and to leave reliable agents there to attend to the collection of his debts due and to become due to him; that he wished us to superintend the collection of rents of the real estate he owned in Richmond, to sell the same, if deemed best by his agents, and in all things to do for himself (Zetelle) precisely as he would do, if he had been present. I was under the belief that he desired to give us full control of his affairs in Virginia as soon as he left. I have no recollection, whatever, of having; promised to remit money in any way, shape or form to-him while he remained abroad, nor did I receive any *746 instruction to remit any coin or sterling money of Great Britain.”
the cause, ■ These positivé and emphatic statements in the answer, and the depositions of the defendants, Myers and Cridland, are not overthrown by any sufficient evidence in But they are confirmed by the pregnant fact, and one full of consequence, that in the power of attorney which created the agency and defined the duties and obligations of the agents, a paper drawn with the utmost pai'ticularity, and widest amplitude, there is not to be found one line or word indicating a purpose to impose on the agents the obligation to remit any moneys which might come to their hands, to their principal in Europe. It would violate every rule of evidence to permit the parol proof of such a chai’acter as we find in this record, to outweigh not only the answer and depositions of the defendants, but to vary and modify in a material respect the written instrument creating the agency, fixing duties, and imposing obligations not to be found in that instrument.
Some stress was laid in the argument of the appellee’s counsel, upon a provision of the deed of trust conveying the real estate to Myers and Cridland, which requires them in the event of selling said estate, “to pay over” the proceeds to Zetelle. This is a very usual and ordinary provision of trust deeds, where the power to sell is ■conferred upon the trustees; but this provision cannot be construed to impose an obligation to “pay over” to the grantor in a foreign country, in time of war, and pending a blockade. Such a construction would be most unreasonable, particularly when the deed of trust and the power of attorney executed at the same time, and for a common object, must be taken together, as constituting the same agency, and effecting the same general ■object.
I am of -opinion, therefore, that the fair and legitimate conclusion to be arrived at from the whole evi *747 deuce, upon the point now under consideration, is—■ 1. That Zetelle, at the time he executed the power of attorney and deed of trust to Myers and Oridland, did not communicate to them that his purpose was to leave the country permanently. It was evidently their impression that his absence was to be temporary—only during the war. But if he had any well defined plan on the subject, I am bound to conclude, from the evidence before us, that it was not communicated to his agents.
2. I am constrained to say that there is nothing in the cause to show, either from the documentary or parol proof, that there was any undertaking or agreement on the part of Myers and Oridland, or either of them, to remit to their principal, in a foreign country, whatever might come into their hands as the agents of Zetelle. The positive and emphatic denial of both Myers and Oridland, sustained and confirmed by the absence of any clause in the power of attorney imposing any such obligation, is further strongly confirmed by the circumstances then surrounding the parties. It is incredible, in the absence of any written obligation to that effect, or proof of the most positive character, that these agents, both acknowledged to be gentlemen of the highest intelligence, should have undertaken to bind themselves to remit funds to Europe under the circumstances then existing. They were in the city of Richmond, at that time the capital of the Southern Confederacy, and the great centre of that power which held in check for four years the greatest armies ever marshaled in modern times; and Richmond was the objective point of all these armies. It was liable to be surrounded and laid in siege any day. The great object of the Federal government was to cut off the communications of this city; and the Federal generals manoeuvred their armies at different points to effect this object. Add to this the fact that our coasts were blockaded, and that blockade becoming more and more effectual every *748 day, and then it is almost incredible that any man in his serises should have undertaken to do that which was ^en difficult, but which any day might become impossible. No men understood these difficulties better than these intelligent agents with whom Zetelle had entrusted his affairs ; the one being a lawyer eminent in his pro- „ 0 0 * fession, tne other representing the British government ag cousuj here, and both intelligent observers of the remarkable events then transpiring. And we are not surprised to find Myers declaring, that if any such obligation, as undertaking to remit funds to Europe under these circumstances had been hinted at, he would unhesitatingly have declined the agency, however pressed upon him; or that Cridland should deny that the agency was created for any such purpose ; accompanied with the statement “ that consuls residing in the Confederate States received dispatches from the British minister in Washington, in which they were particularly cautioned not to transmit anything by means of the existing carrier, or special messenger, or through a British ship of war, but dispatches for the officers of the British government, and letters to their families, written by themselves.”
That there was no obligation on the part of the agents to remit funds to Zetelle, is further confirmed by the fact that they received no communication on the subject from him during his absence. It is shown conclusively that Zetelle was travelling from point to poiut in Europe until his return to the United States in 1863, and that his agents had no knowledge of his whereabouts. According to Zetelle’s own statement, he went first to Liverpool, then to London, then to Paris, then to Marseilles, then to Nice, then to Constantinople, thence to Naples, thence back to Nice, and returned to the United States the winter of 1862-3, spending a part of his time in New York and part in Chicago. But it is certain he knew where they were, and there were three modes of *749 communication open to him, which had been pointed out to him by Oridland before he left. And yet no instructions came from Zetelle on the subject of the agency. It is incredible, upon the theory that Myers and Oridland had undertaken to convert his means here into available funds, and transmit them to Europe, that „ Zetelle should not have communicated with them. It is true Zetelle attempts to explain his failure to do this, by the statement that he had visited the brother of Grid-land, a London attorney, through whom he expected his funds were to be l’emitted, and requested him to write for him on the subject. But in this he is not supported, but rather contradicted, by Mr. Joseph J. Oridland, the London attorney, whose deposition is in the cause. He recollects no conversation between him and Zetelle in reference to a remission of the funds, and is confirmed by the statement of his brother, the agent here, who states that the letter (and he received only one) of Jos. J. Oridland simply referred to his having seen Mr. Zetelle, but contained no instructions whatever, or any reference to his affairs. If there had been any understanding and agreement between Zetelle and his agents that the funds coming into their hands should be remitted to him in Europe, Zetelle would certainly have put himself in communication with them, and would not have remained satisfied to have attempted (admitting his statement to be true) to make that communication through one source when others were open to him ; for Oridland, before he left the city of Bichmond, had informed him that there were three channels of communication open to him, one through his brother, Jos. J. Oridland of London, one through the British consul at Hice (which Zetelle says was the first place of his destination), and one through the British embassy at Washington. With these channels of communication open to him, he fails to write to his agents, and this failure is .a powerful fact to confirm the statements of Myers and *750 Cridland, that there was no agreement on their part to remit funds received by them to Europe.
A minute and careful examination of the whole case forces my mind to the conclusion, that there was no such agreement on the part of the agents. It is not found in the written instruments creating the agency. It is not proved by the parol evidence. It is not consistent with circumstances surrounding the transactions; and it is not consistent with the conduct of the parties.
Having arrived at this conclusion, the discussion of the case is now brought to a much more narrow compass, and the legal questions to be applied to the case as made out, according to my conception, are simple and easy of solution ; because they depend upon well defined principles of courts of Chancery, settled by a course of decisions in England and in this country, too firmly now to be shaken.
The case made by the record is then simply this: Zetelle, having determined to leave the country to escape the dangers and inconveniences of the war, then raging between the Northern and Southern States, constituted Myers and Cridland his agents and attorneys in fact, and conferred upon them the most ample powers and the largest discretion for the management of his business and the disposition of his property; in the language of the power of attorney, to act for Mm “as fully and effectually to all intents and purposes as he himself might or could do by being personally present.”
It is conceded that they had the unquestioned authority to collect the debts due to him, and to sell his estate, real and personal, if in their discretion they thought it best. They did collect his debts and sell his property. The question as to their obligation to remit the funds to Europe having been disposed of, the only question now to be determined is, whether in doing this, and receiving Confederate currency and making investments in Confederate bonds, they have been guilty of such a breach *751 of trust, and violation of duty, as will make them liable to Zetelle for the loss he has suffered. Ho fraud is charged upon the agents, no mala fides is imputed to them, and certainly none is proven. They were both gentlemen of the highest character, and their integrity has not been and cannot be assailed. But it is said that they have been guilty of a gross violation of their duty and a breach of trust in this, that they collected debts which were not due, and were well secured upon valuable real estate; that they sold the real estate of their principal for a depreciated currency, and invested the proceeds, as well as the other funds collected, in Confederate States securities ; and that in this way, they, by their gross negligence of the interests of their principal, and injudicious management, instead of preserving the trust property committed to them, caused its utter loss and destruction.
"When we sit in judgment upon the conduct of these agents, during a period of such remarkable political events as were then transpiring, it would be to the last degree unjust and inequitable to measure their conduct by subsequent events; to characterize as acts of folly, those things which in the light of, the present, may so appear, because of the unfortunate result, and to condemn as criminally injudicious and reckless, conduct which, if events had been different, would have been wise and judicious, and commended of all men. In the light of the present it is easy to discourse wisely of- the folly and infatuation of those times in which men recklessly imperilled their own fortunes and the fortunes of others under their control, in investments which depended upon the result of battles and the fate of war. But that folly and that infatuation was common to a whole people, and men as wise and judicious as any of the present day, embarked their all, and lost their all, by their confidence in a struggle which they felt sure must ultimately triumph. To pass judgment rightly, now, upon their *752 conduct, we must place ourselves in their position, and 1°°^ out upon all the circumstances then surrounding them, not from our standpoint, hut from the standpoint from which they viewed them, and judge accordingly.
Myers and Oridland having undertaken the management of Zetelle’s affairs in his absence, (an agency not of their own seeking, but which was pressed upon them by Zeteile) found themselves in possession of certain notes and bonds amounting to seven or eight thousand dollars, and real estate for which Zeteile paid $2,900 in July 1861.
It has been already seen that they had full authority from Zeteile to collect these bonds and notes and to sell this real estate, and it must be conceded they had the authority to collect in Confederate currency; for at the time of the creation of the agency, to wit: on the 9th September 1861, that currency was coming into general circulation, and was soon afterwards the only currency in circulation in this State.
In March 1862, Myers and Oridland finding that they could sell the real estate of their principal, at a large advance over what he had paid for it in 1861, and not having received any communication from Zeteile, and being in ignorance of his residence, and unable to communicate with him, determined after “ anxious consultation,” (in the language of one of them) to expose the property for sale at public auction, and accordingly sold it on the 81st day of March 1862, for the sum of $4,725. It is insisted that this was an injudicious and reckless exercise of authority on the part of the agents, and especially, when the proceeds were invested by them in Confederate bonds, causing a total loss of the property to their principal. But was it injudicious even, in the light of the circumstances then surrounding the agents ? At that time Confederate currency was but slightly depreciated, and they had a chance of selling the property of their principal at an advance of $1,825 upon its *753 costs six months before. At that time Confederate currency was received in payment of debts and in all the channels of trade without doubt or question, and Confederate securities were eagerly sought after, by corporations as well as individuals, as the safest and most profitable investments that could be made. Courts of Chancery having funds under their control, were daily directing such investments in every county in the Commonwealth, and fiduciaries, with and without the advice of the courts, were seeking such investments as the best that could be made for those they represented.
At that time there was universal confidence in the ultimate triumph of the Confederate cause. The armies of the South had won victory on almost every battle-field ; and here in Virginia had commenced those brilliant triumphs in the Valley, which in a few months afterwards enabled Jackson to unite, with Lee, and culminated in the great battles around Richmond, which forced the grand army of the Potomac, broken and disorganized, to take shelter under the gunboats at Harrison’s landing. At that time and long afterwards the most prosperous, the most prudent and judicious men. in this city ; men of large experience and large success in business ; men marked in the community as prudent and judicious men, were every day selling their real estate under the temptation of high prices and investing the proceeds in Confederate bonds. Myers himself sold his own real estate and that of his sisters for Confederate money, and invested the proceeds in Confederate bonds. Is he to be held to act with greater prudence and forecast for his principal than for himself and for those bound to him by the nearest ties of blood and affection ? If he acted for his principal as he acted for himself, and in doing so followed the example of the most prudent and judicious men, shall the loss fall on him because of the unfortunate result which the wisest men could not foresee ? He was"authorized to do what Zetelle “might or could do *754 if he were personally present.” Suppose Zetelle had been present. Would it have been at all improbable *^at ^e, surrounded by the same circumstances' and influenced by the same examples, would have done precisety the same thing? Is it improbable that he would have been influenced by the advice of his friend Cridland, who was like himself a foreigner, who was an 0f^cer 0f the British government, and through whose kind offices Zetelle was enabled to leave the country. If he had remained in Bichmond does any one doubt, after reading this record, that Cridland would have advised him to sell his real estate, and that Zetelle would have followed that advice ? Cridland, a foreigner, not influenced by the patriotic hopes and desires of Southern men—Cridland, an officer of the British government, an impartial and intelligent observer of passing events, thought at that time the war would be of short duration and result in the triumph of the Southern cause ; Cridland thought it best to sell Zetelle’s real estate when it could be sold at a handsome profit. Would Zetelle have thought otherwise if he had been prepent ? Is it at all probable that he would have acted differently from his intimate and influential friend, the British consul, who, from his official position and connections, had far better opportunities of forming an intelligent opinion upon passing events. I think no impartial mind can give this case a candid examination without coming to the conclusion that all the probabilities are that Zetelle, if he had been himself personally present in Bichmond, would have done precisely what his agents, Myers and Cridland, did, so far as the sale of his real estate was concerned.
But it is said that these agents were guilty of a gross violation of duty and breach of trust because they collected the notes of Wendlinger and the bond of Andrew Pizzini, all of which were well secured upon real estate in this city. So far as the notes of Wendlinger are con *755 cerned, it is sufficient to remark that they were negotiable notes, payable at one of the Richmond banks, and were collected by the bank in the usual course of-business, and in the only currency then received and paid out by the banks. The collection of the note of Andrew Pizzini, which was not payable until the 1st November 1865, requires more particular notice. The collection of this note was certainly not without authority, however injudicious we may say it was ; for the power under which the agents were acting, voluntarily conferred upon them by Zetelle, authorized them to collect all his debts, whether due or not. So that they did not act without authority, if they did act without judgment and due discretion. Certainly, as events have transpired, it would have been most prudent, and they would have best consulted the interest of their principal, if they had refused to receive this debt. But having the authority to receive it, its collection was at most an error of judgment only. But was it such an error as constituted a violation of duty and breach of trust, for which they or Pizzini can be held responsible for the loss which Zetelle has unfortunately suffered ? If it was simply an error of judgment, without any of the elements of mala fvles, without any intention or motive to defraud their principal, and is not characterized by a reckless negligence and disregard of their principal’s interests, so as to constitute a violation of duty and breach of trust, then no legal liability can attach to the agents.
To determine these questions we must again look to the circumstances which surrounded the agents from the standpoint which they occupied. This debt was paid in January 1868. Both Myers and Oridland say that it was the subject of anxious consideration and consultation between them, whether they should receive this money. They both gave the same reason why they thought it best under all the circumstances to collect it. At that time-the Confederate armies had met with serious re *756 verses. The city of Richmond was threatened, if not actually invested, by powerful armies from different points. They had every reason to believe that the city would be bombarded, and burnt if taken. The security f°r the debt of Pizzini was the house which was mortgaged to secure the debt. If that was burned, it was ° ° doubtful if the debt could be made.
The evacuation of Richmond was an event that might be expected any day. They had no reason to believe that the evacuation of this city would be followed by the surrender of the southern armies, but that the war might still continue, and the southern cause yet be triumphant; and that the best security they could have would be the bonds of the Confederacy. With this belief, and under these circumstances, they received the debt of Pizzini. Looking back upon these events from our standpoint, we may say it was an act of folly upon the part of these agents to collect this debt, so well secured ; but can we say that, under the circumstances which then existed, they acted with such reckless disregard of their obligations as to impose on them a legal liability for their conduct. All we can say is, that it would have been better’, as events have transpired, if they had not received this debt; but we cannot say that, under all the circumstances* they were guilty of a breach of trust and violation of duty. It is easy to conclude now, that a deed of trust upon a house and lot in the city of Richmond was better security for a debt of five thousand dollars than a bond of the Confederate States. But when that city is threatened by beleaguering armies with bombardment and fire, we may conclude that a man at least acted honestly and in good faith, who, having unwavering confidence in the triumph of the southern cause, preferred a bond of the Confederate States as better security than property thus threatened with ^destruction.
But again it is urged, that these agents had no autho *757 rity to make investments of the funds they received in Confederate bonds. It seems to me to be a full answer to this argument to say, that the same investment was made of the funds of Zetelle, which Myers, one of his agents, made for himself. Myers invested for himself the sum of $10,000, part of which was for proceeds of real estate sold about the time he and Cridland sold Zetelle’s real estate. He invested for his sisters and cousins over $25,000. Can there be mala Jides charged against a man who made these large investments for himself and those nearest to him by the ties of blood ?
But let it be remembered, that these agents were cut off from all communication with their principal, without any knowledge of his whereabouts, and without the power of communicating with him. They find themselves in possession of a lai’ge fund belonging to their principal. What are they to do with it ? It is their duty certainly to invest it in an interest bearing fund. They find the most judicious and prudent men making investments in Confederate States bonds. One of them has invested for himself and those dependent upon him, the sum of $35,000 ; and under these circumstances they conclude to make the same investment for their principal, who is in a foreign country, and who has given them no instructions, and with whom they cannot possibly communicate. How can it be said that in doing this they have been guilty of a breach of trust and a violation of duty, for which they shall be held responsible ?
But let it be conceded that these agents did commit errors of judgment; that by a different course they might have saved a large portion of their principal’s estate from the wreck and ruin of the war ; that if they had not sold his real estate, that would have escaped the hazards of sequestration, as well as the fires which did at last consume a large portion of this city; that the debt of Pizzini, if they had let it remain till due, would *758 have been also saved to their principal : admit all this, aad yet, in the absence of any proof of fraud or mala jides, upon the well settled principles of courts of equity, they cannot be held liable for the loss their principal has suffered. That loss must fall on him, and not on them.
There has been great uniformity in the decisions of the English and American courts in the application of the eqUp;able principles which fix the liability of trustees and other fiduciaries, with respect to the trust subject; and I believe no case can be found where a trustee guilty of no mala jides, has ever been held responsible for a loss occurring from a mere error of judgment, without any wilful default on his part when the act done was within the power under which he acted. In Jackson v. Jackson, 1 Atk. R. 513, Lord Hardwicke said: “To compel trustees to make up a deficiency not owing to their wilful default is the harshest demand that can be made in a court of Equity.” In Knight v. Lord Plymouth, 3 Atk. R. 480; S. C. 1 Dick. R. 120, the same great judge uses the following language : “If there is no mala jides, nothing wrongful in the conduct of the trustee, the court will always favor him. For as a trust is an office necessary between man and man, and which if faithfully discharged is attended with no small degree of anxiety and trouble, it is an act of great kindness in any one to accept it. To add hazard or risk, to that trouble, and to subject a trustee to losses he could not foresee, would be a manifest hardship, and would be deterring every one from accepting so necessary an office.” See, also, Belchier v. Parsons, 1 Amb. R. 218; Rowth v. Howell, 3 Ves. R. 565; Adams v. Claxton, 6 Id. 226. As late as 1843, the master of the rolls (Lord Langdale) would not charge fiduciaries “when they pursued that which was considered the most prudent and proper course, and a loss has unfortunately arisen.” Edmunds v. Peake, 7 Beav. R. 239, 243, 29 Eug. Ch. R.
The courts of blew York have repeatedly declared the- *759 same doctrines. In Thompson v. Brown, 4 Johns. Ch. R. 619-628, Chancellor Kent, after expressing his coneurrence in the views of Lord Hardwicke, above quoted, declares, that “ where there is no just imputation of mala jides, and the fault is but, at most, an error of judgment, and a want of sharp-sighted vigilance, it would have the appearance of great rigor, and would be hardly reconeilable with the doctrines of a court of equity, to hold a trustee responsible.” And in Franklin v. Osgood, 14 John. R. 527-560, Platt, J., says, “It is not necessary to show that the trustee acted with all the prudence and sagacity that might have been used. ”
In Pennsylvania the same doctrines have been repeatedly declared. In Konigmacher v. Kimmel, 1 Penr. & Watts R. 207-215, the court, speaking of the “standard by which trustees are to be held liable,” say, “ preeminent knowledge and uncommon foresight are not required. Ordinary men are to be compared and judged by the standard of ordinary men. Common skill, common prudence and common caution are all that courts have required or ought to require.”
In Zebach's lessee v. Smith, 3 Binn. R. 69, 73, in a case in Pennsylvania growing out of a ' sale of land in 1779 for continental money, for an inadequate price, and when there seemed to be no pressing necessity for the sale, Teates, J., said, “It would be unreasonable to judge of the conduct of W. from subsequent events. His conduct ought not to be condemned if it flowed from an honest though uninformed and mistaken judgment.” See also Burr v. McElvine, 1 Bald. R. 162; Gray v. Lynch, 8 Gill’s R. 403, 430; Hart v. Ten Eyck, 2 John. Ch. R. 62; Wilkinson v. Stafford, 1 Ves. jr. R. 32.
In Virginia these same doctrines have become well settled by repeated and very recent decisions of this court. In Carter v. Elliott, 9 Gratt. 511, 559, Judge Lee, delivering the opinion of the court, after reviewing many of the leading English and American cases, says: *760 “ The fair result of the views they present and the reasoniug they adopt is, that where a trustee has acted in good faith, in the exercise of a fair discretion, and in the same manner in which he probably would have acted if the subject had been his own property and not held in *rus1;’ ought not to be held responsible for any loss accruing in the management of the trust fund. * * * * jj. js q0UbtM whether a wise policy should ever require more of a trustee than that he should act in good faith and with the same prudence and discretion that he is accustomed to exercise in the management of his own affairs.”
The principles settled by the case of Elliott v. Carter were approved and reaffirmed in the case of Davis, trustee, v. Harman, decided at the last Wytheville term of this court, supra 194, and may now be regarded as the ' settled law of this State.
Applying these well settled principles of equity jurisprudence to the case under consideration, I am constrained to say, that the loss which has unfortunately occurred, ought not to fall on these agents and trustees. That they had the authority to collect the debts due Zeteiie, and to sell the real estate, cannot be denied. That they acted with the utmost good faith, and with an honest though (as events have transpired) a mistaken judgment, must be conceded. The loss which Zeteiie has unfortunately suffered was certainly not caused by the wilful or negligent conduct of his agents. They could have had no other motive in what they did, than an honest, if misguided, purpose .to promote the interests of. their principal. One of them was his intimate friend, who had shown himself ready under trying circumstances to do kind offices for him, and not a step was taken without his co-operation and advice. The other was a gentleman of such high character and unblemished reputation for integrity, that it is impossible to conceive that he would act otherwise than with *761 the utmost fidelity to such a trust. And it is shown that he made the same disposition of his own property as that of his principal. The only motive suggested, inconsistent with an honest purpose to protect the interests of their principal, was that they sold his property and collected his debts, in order that they might be the recipients of the paltry sum of five per cent, commission in Confederate money, to be divided between them. To such an unworthy motive all" the circumstances of the case and the high character of the parties afford an incontestible refutation.
The serious loss which must fall upon the appellee (Zetelle) is the result, not of the wilful negligence or misconduct of his agents, but of a disastrous civil war, which has spread a fiood of ruin and desolation over the land, engulphing the fortunes and wrecking the hopes of half the people of this Commonwealth. To make these trustees and agents liable now, would be to hold them responsible for an unerring discretion, for a judgment infallible, and a forecast beyond all mental prescience.
The result of these views is, that neither Pizzini nor Myers and Cridland can be made liable to Zetelle for the unfortunate loss he has suffered.
I am painfully impressed with the hardship of this decision upon the appellee. And it would be an equal hardship upon the appellants, if the decision were otherwise. The loss cannot be divided. It must fall upon the one side or the other. ~We must place it where the established adjudications of the courts and the firmly settled rules of equity have authoritatively fixed it.
I am of opinion that the decree of the Circuit court of the city of Richmond should be reversed, and that the bill of the appellee be dismissed.
The other judges concurred in the opinion of Christian, J.
Decree reversed.